FILED

2020 Sep-29  PM 03:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **Cassius Ramon Harris,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  2:19-cv-00841-AMM** |
| | ) | |
| **Social   Security   Administration,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

Plaintiff Cassius Ramon Harris brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record and the parties' briefs, the court **REVERSES** and **REMANDS** the decision of the Commissioner.

## I.    Introduction

On June 5, 2017, Mr. Harris protectively filed an application for benefits under Title II of the Act alleging disability as of December 23, 2015. R. 24, 90-91. Mr. Harris's application alleges disability due to chronic pulmonary sarcoidosis, pulmonary hypertension, combat related PTSD, obstructive sleep apnea,

hypertension, left ventricular disfunction, chronic dry eye disease, hyperlipidemia, severe mood disorder, and bilateral achilles tendonitis. R. 90-91. He is a college graduate and has past relevant work experience as an imagery analyst and a professional fire fighter/EMT. R. 103, 205.

The Social Security Administration ("SSA") initially denied Mr. Harris's application on November 22, 2017. R. 24, 105-11. On January 11, 2018, Mr. Harris filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 24. That request was granted, R. 114-16, and Mr. Harris received a hearing before ALJ Clarence Guthrie on January 10, 2019. R. 24, 41-86. On February 15, 2019, the ALJ issued an unfavorable decision, finding that Mr. Harris was not disabled from December 23, 2015 through the date of the decision. R. 21-35. Mr. Harris was 42 years old at the time of the ALJ decision. R. 35, 90.

Mr. Harris appealed to the Appeals Council. R. 167-70. Mr. Harris submitted a letter brief and additional evidence. R. 2, 8-15, 309-13. After the Appeals Council denied Mr. Harris's request for review of the ALJ's decision, R. 1-4, the ALJ's decision became the final decision of the Commissioner and subject to this court's review.

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work

activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id. Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of

performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

The ALJ determined that Mr. Harris meets the insured status requirements of the Act through December 31, 2022. R. 26. Next, the ALJ found that Mr. Harris had not engaged in substantial gainful activity since his alleged onset date of disability, December 23, 2015. R. 26. The ALJ decided that, since that date, Mr. Harris has had the following severe impairments: morbid obesity, degenerative joint disease of the bilateral shoulders, sarcoidosis, systemic hypertension, pulmonary hypertension, post-traumatic stress disorder ("PTSD"), depression, and mood disorder. R. 26. As to Mr. Harris's complaint of a sleep-related breathing disorder, the ALJ found it to be a "non-severe impairment" on the ground that the medical evidence established that Mr. Harris's "obstructive sleep apnea is controlled with continuous positive

airway pressure therapy." R. 27. Overall, the ALJ determined that Mr. Harris did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 27-29.

The ALJ found that Mr. Harris had the residual functional capacity to perform sedentary work with certain non-exertional limitations. R. 29. The ALJ determined that Mr. Harris can:

> occasionally climb ladders, ropes, or scaffolds; can frequently reach bilaterally; can occasionally be exposed to weather or humidity, extreme cold, extreme heat, irritants such as fumes, odors, dust, and gases, poorly ventilated areas, and chemicals; can never be exposed to workplace hazards such as moving mechanical parts and high exposed places; can work in a low stress work environment, defined as: tasks that are simple and routine in nature with no inflexible or fast-paced production requirements (such as assembly line work) and no more than occasional changes in the work setting; can work in a non-public work setting with only incidental contact with co-workers and no tandem tasks; and can accept instructions and respond appropriately to supervisors, where this interaction occurs occasionally throughout the day.

R. 29.

According to the ALJ, Mr. Harris is "unable to perform any past relevant work," he is a "younger individual," and he has "at least a high school education," as those terms are defined by the regulations. R. 33. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability

because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." R. 33. Because Mr. Harris cannot perform the full range of sedentary work, the ALJ enlisted a vocational expert and used Medical-Vocation Rule 201.28 as a guideline to ascertain whether there are a significant number of jobs in the national economy that Mr. Harris is capable of performing. That expert concluded that there are indeed a significant number of such jobs in the national economy, such as bench and table worker, assembler, surveillance-system monitor, and inspector. R. 34. Based upon these findings, the ALJ concluded that Mr. Harris did not have a disability as defined in the Act, from December 23, 2015 through February 15, 2019. R. 35. Mr. Harris now challenges that decision.

## II.    Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the

facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. However, no decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## III. Discussion

### A. Applicable Law

As noted above, at the *fifth* step of the disability determination, the Commissioner must show "the existence of other jobs in the national economy

which, given the claimant's impairments, the claimant can perform." *Hale v. Brown*, 831 F.2d 1007, 1011 (11th Cir. 1987). "The SSA's regulations establish how the agency may determine whether there is suitable work available in the national economy at step five." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018); *see* 20 C.F.R. § 404.1566. The regulations provide that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [his] physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b).

In making this determination, the ALJ may take administrative notice of job data, such as: "(1) Dictionary of Occupational Titles, published by the Department of Labor[.]" *Id.* at § 404.1566(d). Additionally, "[i]f the issue in determining whether [the claimant is] disabled is whether [his] work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, [the ALJ] may use the services of a vocational expert or other specialist." *Id.* at § 404. 1566(e); *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999) (stating that when the claimant cannot perform a full range of work or has non-exertional impairments that significantly limit basic work skills, the primary method for determining whether the claimant can perform other jobs is through vocational expert testimony). An ALJ poses hypothetical questions to a vocational expert to

obtain testimony. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002).

Ordinarily, vocational expert evidence should be consistent with the DOT. Social Security Ruling 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000) ("SSR 00-4p"). When a vocational expert's testimony conflicts with the DOT, there are certain duties that the ALJ must discharge. The SSA has issued a Policy Interpretation Ruling governing the use of vocational expert evidence in disability decision-making "to clarify [its] standards for identifying and resolving" "conflicts between occupational evidence provided by a [vocational expert]…and information in the DOT." *Id.* As the Eleventh Circuit has explained, "SSR 00-4p imposes a duty on ALJs to identify and resolve apparent conflicts between DOT data and [vocational expert] testimony." *Washington*, 906 F.3d at 1362.

Under SSR 00-4p and *Washington*, the ALJ must affirmatively identify apparent conflicts, "explain any discrepancy[,] and detail in the decision how the discrepancy was resolved." *Id;* SSR 00-4p, at *1 (directing the ALJ to "[i]dentify and obtain a reasonable explanation for any conflicts"). This is an affirmative duty of the ALJ and does not depend on notice of apparent conflicts by the claimant. *Id.*

at 1362-63; SSR 00-4p, at *4 (providing that ALJ "must explain the resolution of the conflict irrespective of how the conflict was identified").

If an ALJ fails to "properly discharge this duty," his decision is not supported by substantial evidence. *Washington*, 906 F.3d at 1362. Additionally, an ALJ's attempt to explain away obvious conflicts without resolving them warrants remand. *See Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008).

### B.     Vocational Expert Testimony and the ALJ's Decision

The ALJ called vocational expert Dr. David W. Head to testify at the administrative hearing. R. 78-85. First, Dr. Head testified that Mr. Harris's past work could be classified as an intelligence specialist, firefighter, and EMT. R. 79. Next, the ALJ asked Dr. Head: "Will you please advise us if your opinions conflict with the <u>Dictionary of Occupational Titles</u>?" R. 80. Dr. Head responded: "Yes." R. 80. The ALJ did not ask any questions about this conflict. R. 80. Instead, he asked hypothetical questions to Dr. Head. R. 80.

The ALJ's initial hypothetical question tracked Mr. Harris's residual functional capacity, as determined by the ALJ, with the following exception: while the residual functional capacity limited Mr. Harris to "a non-public work setting with only *incidental* contact with co-workers and no tandem tasks," R. 29, the hypothetical referred to "*occasional* interaction with the public and with co-workers." R. 80 (emphasis added). In response to this hypothetical, Dr. Head

identified four jobs suitable for Mr. Harris: bench and table worker, assembler, surveillance-system monitor, and inspector. R. 81. The ALJ then modified the hypothetical to track the language in the residual functional capacity, and Dr. Head testified that Mr. Harris would still be able to perform the four named jobs. R. 82.

Mr. Harris's attorney cross-examined Dr. Head and likewise asked hypothetical questions. R. 83-85. In response to the attorney's hypothetical questions, Dr. Head testified that the jobs identified would be eliminated if the individual in the hypothetical: "has marked limitations in the ability to accept instructions and respond appropriately to criticism from supervisors;" has "a marked limitation in the ability to respond to changes in the work setting;" or "has a marked limitation in the ability to interact with coworkers, supervisors or the general public." R. 84.

Following cross-examination, the vocational expert testified:

> ALJ: Okay. Dr. Head, if there are any discrepancies between the exact requirements of the hypotheticals I gave you and the exact requirements of those jobs in the DOT, how did you resolve any discrepancies that you saw?
>
> [Dr. Head]: That would be based on my training and experience and particularly in testifying in Social Security hearings.
>
> ALJ: Okay. So it's your professional opinion that those jobs are available in those numbers, with those hypotheticals I gave, is that right?
>
> [Dr. Head]: Yes, sir.

R. 85.

In relying on Dr. Head's testimony, the ALJ stated: "The vocational expert testified that any discrepancies between the hypotheticals and the *Dictionary of Occupational Titles* were based upon his education and experience in the field. I relied on the vocational expert's expertise to the extent that there was a conflict between the vocational expert's testimony and the information contained in the *Dictionary of Occupational Titles*." R. 34.

Additionally, the ALJ addressed his finding that Mr. Harris had a "marked" limitation in interacting with others and Dr. Head's testimony that such a limitation would eliminate the jobs for the hypothetical individual, as follows:

> I also note that in response to questioning by the claimant's representative, the vocational expert testified that there would be no jobs that an individual could perform if the individual had a "marked" limitation in interacting with others. The term "marked" is not defined in the *Dictionary of Occupational Titles*, and was not defined for the vocational expert, thus making the vocational expert's response unclear. Indeed, I have found the claimant to have "marked" limitations in interacting with others, however I have accounted for these marked limitations with the significant social restrictions in the claimant's residual functional capacity, which are expressed in vocational terms. I have relied on the vocational expert's response to the residual functional capacity set forth above, which included specific function-by-function abilities.

R. 34-35. The ALJ's written decision states: "In interacting with others, the claimant has a marked limitation." R. 28.

### C. Analysis

Mr. Harris claims that even with the residual functional capacity determined by the ALJ, he cannot perform any jobs identified by the ALJ and vocational expert. Doc. 11 at 23. Specifically, Mr. Harris asserts there is an apparent conflict between the jobs identified and the limitations found. The job of bench and table worker requires constant reaching, but the ALJ found Mr. Harris is limited to frequent reaching. *Id.* Additionally, the vocational expert identified assembler jobs, but the ALJ specifically eliminated assembly line work. *Id.* at 24. The vocational expert identified inspector jobs, but Mr. Harris notes that "there is no such position listed" in the applicable resources. *Id.* at 25. As to the jobs of bench and table worker, assembler, and inspector, the Commissioner acknowledges "an unresolved conflict between the DOT's job descriptions…and the [vocational expert's] testimony that an individual with [Mr. Harris's] reaching limitations could perform those jobs." Doc. 15 at 18.

Although applicable law requires the ALJ to identify conflicts between the DOT's job descriptions and vocational expert testimony, "explain any discrepancy, and detail in the decision how the discrepancy was resolved," *Washington*, 906 F.3d at 1362; *accord* SSR 00-4p, the ALJ did not do that here. Faced with an obvious,

admitted conflict between the DOT and the vocational expert's testimony, the ALJ did not identify it, inquire into it, resolve it, or obtain a reasonable explanation for it. The ALJ erred in failing to discharge these duties.

The Commissioner does not assert that the ALJ discharged the duties. Instead, the Commissioner argues that the ALJ's error is harmless because Mr. Harris can perform work as another job identified – surveillance-system monitor. Doc. 15 at 18. Mr. Harris argues that he cannot perform the job of surveillance-system monitor both because the job is substantially the same as his past work and because he is limited to low-stress work. Doc. 18 at 5-6.

There are three problems with the ALJ's ruling in this regard. *First*, after finding that Mr. Harris could not perform his past work as intelligence specialist,[1] the ALJ did not identify, let alone address, the apparent conflict between the vocational expert's findings about Mr. Harris's past relevant work as an intelligence specialist and the job of surveillance-system monitor. The ALJ's decision does not discuss the evidence about similar adverse mental health impacts of these jobs.

More particularly, the record shows that with respect to his past work in the Air Force, which the vocational expert classified as intelligence specialist work, the ALJ found (1) that Mr. Harris is unable to perform that work, R. 33, and (2) that

---

[1] At the hearing, the ALJ verbalized this finding: "I mean, as far as being an imagery analyst for the Air Force, we can mechanically put that together and you can't do that any more." R. 76.

work was the cause of Mr. Harris's PTSD. R. 29. While serving in the Air Force, Mr. Harris was deployed in place in Birmingham. R. 57. At the ALJ hearing, Mr. Harris testified that, "we were the eyes for the predator and reaper and full motion video, real life video -- we did close air support, BDA, vehicle follows, persistent surveillance of things like that, of high value targets to the United States military and we took them out." R. 57-58. It was after a difficult mission in the fall of 2015 that Mr. Harris went to see Dr. David Myers and was diagnosed with PTSD. R. 72, 88. Dr. Myers's letter regarding his 2015 diagnostic interview, which was considered by the ALJ, states that Mr. Harris reported symptoms of hypervigilance, triggering events, withdrawal, intense physiological distress, feelings of detachment, startle responses, and difficulty concentrating. R. 630.

After his PTSD diagnosis, the Air Force took Mr. Harris off surveillance mission in 2015 and medically retired him in November 2017. R. 72, 285. The Air Force records indicate that Mr. Harris "witnessed death and destruction while performing target surveillance for drones and has been treated with multiple psychotropic medications and psychotherapy. Despite treatment, symptoms of…conditions have not resolved and render [Mr. Harris] unfit for continued medical service." R. 288. The VA's Disability Benefits Questionnaire for Mr. Harris's PTSD reflects that he experiences the following symptoms: "recurrent, involuntary, and intrusive distressing memories of the traumatic event(s);" "recurrent distressing

dreams in which the content and/or affect of the dream are related to the traumatic event(s); "intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event(s)." R. 913-14.

As defined in the DOT listing, the surveillance-system monitor job is a "protective service occupation," requiring an individual to "monitor[] premises…to detect crime or disturbances…using closed circuit television monitors" and "[o]bserve[] television screens." Doc. 12-4. The vocational expert described the job of surveillance-system monitor as "one that does not call for interacting with the public but observing the public on a screen, either for violations of safety or of legal requirements." R. 81.

The record contains no testimony about or analysis of Mr. Harris's ability to do a job similar to his past relevant work, which he can no longer do and which caused his PTSD. The ALJ's failure to identify this discrepancy, let alone resolve it or detail in the decision how he resolved it, or obtain a reasonable explanation for it, violated applicable law and SSR 00-4p.

*Second*, the ALJ did not identify, let alone address, another apparent conflict between the vocational expert testimony and the DOT regarding Mr. Harris's ability to perform the surveillance-system monitor job – namely, a discrepancy concerning Mr. Harris's ability to interact frequently with co-workers. The ALJ found that Mr.

Harris's residual functional capacity is limited to "work in a non-public work setting with only incidental contact with co-workers and no tandem tasks" and interaction with supervisors "where this interaction occurs occasionally throughout the day." R. 29. The vocational expert testified that Mr. Harris would not be able to perform the jobs identified – including surveillance-system monitor – if he had a "marked limitation in the ability to interact with coworkers, supervisors or the general public." R. 84. And, the DOT entry for surveillance-system monitor is replete with indications that the job involves frequent interaction with people: "notifies authorities by telephone of need for corrective action;" "telephones police or other designated agency to notify authorities of location of disruptive activity;" "notifies repair service of equipment malfunctions;" and "Speaking-Signaling: Talking with and/or signaling people to convey or exchange information. Includes giving assignments and/or directions to helpers or assistants." Doc. 12-4 at 1-2.[2] Additionally, for all job listings in the DOT, various "temperaments" are listed. For surveillance-system monitor, one temperament is P, which indicates "dealing with people." *Id.* at 6. The P "variable involves interpersonal relationships in job situations beyond receiving work instructions." Operational Definitions of Vocational Temperaments, Handbook for Analyzing Jobs (USDOL, 1991).

---

[2] The court takes judicial notice of the information contained in the Dictionary of Occupational Titles. *See Moon v. Astrue*, 2010 WL 749635, at *5 n.5 (M.D. Ga. Feb. 25, 2010).

Put simply, **all** the record evidence on this issue reflects an apparent, unresolved conflict between the DOT listing for surveillance-system monitor and Mr. Harris's residual functional capacity limitations. "[T]he conflict is manifest from even a cursory, side-by-side comparison of the [vocational expert's] testimony and the DOT." *Washington*, 906 F.3d at 1366. "This doesn't mean that the [vocational expert] was wrong, but it does mean that there was a conflict, it was apparent, and it was important." *Id.* As with the previous conflict, the ALJ's reliance on the vocational expert's testimony without resolving the conflict and detailing in his decision his basis for the resolution, or obtaining a reasonable explanation for it, violated applicable law and SSR 00-4p.

*Third*, the internal inconsistencies and contradictions in the vocational expert's testimony required the ALJ to investigate further, and his failure to do so requires reversal. The "ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id.* at 1364 (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)). Throughout the vocational expert's testimony there was contradiction and confusion regarding Mr. Harris's ability to perform the jobs identified by the vocational expert. Notably, the Commissioner concedes that three of the four jobs identified by the vocational expert

directly conflicted with the reaching limitations in the residual functional capacity delineated by the ALJ. Doc. 15 at 18.

Additionally, there was contradictory testimony regarding the availability of jobs and Mr. Harris's limitations with working with others. R. 81, 82, 84. The vocational expert testified on direct examination that an individual limited to a non-public setting, with only incidental contact with coworkers, and occasional supervision would be able to perform the four jobs identified. R. 82. However, on cross examination, the vocational expert testified that an individual with a "marked limitation in the ability to interact with coworkers, supervisors or the general public," would not be able to perform the identified jobs. R. 84.

The conflict between the vocational expert's testimony on direct examination and his testimony on cross-examination should have been apparent to the ALJ. *See Overman*, 546 F.3d at 464. As in *Washington*, the ALJ asked nothing of the vocational expert to elicit a "fuller" explanation. *Washington*, 906 F.3d at 1366. Instead, "[t]he vocational expert's testimony was internally inconsistent, and created a critical void in the record." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1282-83 (11th Cir. 2020). As in *Goode*, it is not the court's "job or duty to speculate on what the testimony would have been without the error." *Id.* at 1283.

In any event, the record reflects that the contradiction was apparent to the ALJ when he drafted his decision: the ALJ appears to "attempt[] to rescue the [vocational

expert's] testimony" by stating the vocational expert was not given a definition of "marked." *See Overman*, 546 F.3d at 464; R. 34-35. Implicit in "the ALJ's attempt to explain away the seemingly contradictory statements is … an acknowledgment that there were apparent discrepancies." *Overman*, 546 F.3d at 464.

Ultimately, because of the apparent conflicts between the vocational expert's testimony and the DOT, the unresolved and unexplained conflict between the vocational expert's testimony and the ALJ's findings, and the internal inconsistencies in the vocational expert's testimony, the vocational expert's testimony was unreliable. *Overman*, 546 F.3d at 465. "[A] finding based on such unreliable vocational expert testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Goode*, 966 F.3d at 1282 (internal quotations marks omitted). [3]

## VI.   Conclusion

The ALJ's determination that Mr. Harris is not disabled is not supported by substantial evidence. The Commissioner's final decision is therefore reversed and remanded to the Commissioner to conduct further proceedings consistent with this

---

[3] Mr. Harris also argues that the ALJ erred in his evaluation of Mr. Harris's mental health limitations and morbid obesity. Doc. 11 at 10-23. Additionally, Mr. Harris argues that the Appeals Council erred in denying review based on the evidence he submitted after the ALJ's denial decision. *Id.* at 21-24. Because the court is remanding the case on the basis of the errors discussed above, the court does not reach the other issues raised by Mr. Harris.

opinion. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this 29th day of September, 2020.

_____
**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE